**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 97-40663

Summary Calendar.

CALHOUN COUNTY, TEXAS, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

Jan. 22, 1998.

Appeal from the United States District Court for the Southern District of Texas.

Before REYNALDO G. GARZA, STEWART and PARKER, Circuit Judges.

PER CURIAM:

This case involves Calhoun County's action to quiet title to certain lands claimed by the United States. The district court dismissed for lack of jurisdiction based on the expiration of the applicable statute of limitations. For the reasons set forth below, we affirm the district court's order.

## I. Factual and Procedural Background

*A. Federal land on Matagorda Island*

Matagorda Island is a 57,000 acre barrier island located in Calhoun County, Texas, with a long history of litigation in federal court. In the early 1940's, the federal government condemned 41 parcels of land constituting almost 19,000 acres of privately owned land on the eastern half of the northern portion of the island. *See United States v. 35,220 Acres of Land,* C.A. No. 22

(S.D.Tex.1940). The government's First Amended Petition for Condemnation named the Calhoun County tax assessor as a defendant, and its Third Amended Petition in Condemnation listed Calhoun County as a defendant.

The court issued a Final Judgment on the Declaration of Taking, which allowed the United States to take possession of the condemned lands, and a Judgment on the Declaration of Taking, which specified the lands condemned and that the United States took full and complete possession of those lands in fee simple. The United States War Department, and later the Air Force, used the federal lands as a bombing and gunnery range until 1971, when it allowed the Department of the Interior ("DOI") to manage the lands for use as a wildlife refuge. In 1982, the Air Force transferred jurisdiction over the federal lands to the DOI.

*B. State land on Matagorda Island*

From October 8, 1942 until 1971, the federal government condemned for a term of years nearly 17,000 acres of state-owned land making up the northern half of the western portion of Matagorda Island. *See United States v. 16,579.70 Acres of Land,* C.A. No. 41 (S.D.Tex.1942); *United States v. Certain Public Roads and Highways on Matagorda Island,* C.A. No. 165 (S.D.Tex.1951); *United States v. 16,579.70 Acres of Land, More or Less, Situated in Calhoun County,* C.A. No. 336 (S.D.Tex.1957); *United States v. 16,579.70 Acres of Land,* C.A. No.487-488 (S.D.Tex.1966); *United States v. 17,499.11 Acres of Land in Calhoun County,* C.A. No. 70-V-14 (S.D.Tex.1970). Each of these actions involved essentially the

2

same acreage, which the State of Texas owned.

On October 8, 1942, the United States filed Cause of Action Number 41, and successfully condemned the 17,000 acres for a term of years, subject to existing easements for public roads, highways, utilities, railroads, and pipelines. The 1942 petition recognized that Calhoun County may have had some interest in part of the condemned land, but did not specify any particular parcel as belonging to the county. On May 29, 1951, in Cause of Action Number 165, a related action, the United States successfully petitioned to condemn the public roads and highways on Matagorda Island over which the state had reserved easements pursuant to the government's initial condemnation action.

In its third and fourth condemnation actions, Civil Action Number 336 and Civil Actions Number 487-488, the United States again condemned the same land, public roads, and highways which it had condemned in 1941 and 1951 because the term of years under each of the first two actions had expired. Calhoun County participated in the stipulated final judgment in Civil Actions Number 487-488, which recited Calhoun County's stipulation that it had waived "all claims for remuneration of damages for the limited takings of its public roads, highways and easements on and across said 16,579.70 acres...." In exchange, Calhoun County reserved a right to request administrative action to set aside a National Historical Shrine, with connecting causeway and highway easements to Port O'Connor, Texas.

On June 23, 1970, the United States filed its fifth and final

condemnation action regarding the Matagorda Island properties, Civil Action Number 70-V-14, resulting in condemnation of the same approximately 17,000 acres for a term of years which the United States could extend until June 30, 1977. On December 2, 1970, Calhoun County filed a "Disclaimer and Reservation" in the case, providing that Calhoun County:

> has no claim to an interest in the compensation to be awarded in this proceeding, and in waiving all claims for remuneration of damages for the limited taking, if any, of its public roads, highways and easements on and across said 17,499.11 acres of land, reserves in lieu thereof the election to request administrative action to set aside a National Historical Shrine....

The district judge dismissed Calhoun County from the suit.

*C. Management of State and Federal land on Matagorda Island*

In November, 1971, the Air Force and the DOI entered into a Memorandum of Understanding (the "1971 MOU"), pursuant to which the Fish and Wildlife Service ("FWS") began using the leasehold lands as part of the National Wildlife Refuge System. In September 1975, the Air Force declared the federally owned lands to be in excess of its needs and terminated its leasehold interest in the adjacent acreage. The DOI applied to the General Services Administration ("GSA") for a transfer of the approximately 19,000 federally owned acres to the FWS, and the State of Texas applied to the GSA for a transfer of the adjacent leasehold lands to the State of Texas for use as a state park.

In October, 1982, the FWS and the GSA published an environmental impact statement ("EIS") proposing the termination of the 1971 MOU between the Air Force and the DOI and the transfer of

4

jurisdiction over the federally owned land to the FWS to manage as a unit of the National Wildlife Refuge System. In addition, the FWS proposed to exchange easements with the Texas General Lands Office, thereby allowing the Texas Parks and Wildlife Department to operate the 19,000 acres of federal land as a state park and providing the FWS with a conservation easement on the adjacent state-owned land. The EIS included a provision that would have prohibited any entity other than the FWS or the State of Texas from having access to publicly owned parts of Matagorda Island. The EIS did not indicate that Calhoun County had any rights in or on Matagorda Island. As required by federal law, the Federal Register contained a notice regarding the preparation of the EIS. Notice, 47 Fed.Reg. 5048 (1982). In addition, the FWS hosted public meetings to discuss the EIS, which a local newspaper mentioned.

In October, 1982, the Texas Parks and Wildlife Department published its own "conceptual plan" for Matagorda Island. This plan would have left only two miles of managed beach available for public use with limitations on the types of activities allowed there. The conceptual plan did not refer to Calhoun County as having any ownership interest on the Island.

On December 8, 1982, the FWS and the Governor of Texas entered into a Memorandum of Agreement (the "1982 MOA") implementing the proposals presented in the EIS. The 1982 MOA provides for integrated management of all publicly owned land on Matagorda Island by the United States and the State of Texas. The 1982 MOA further provides that the State of Texas may not authorize any use

5

affecting either the federal lands or the federal conservation easement unless the FWS determines the use to be compatible with the purposes of the National Wildlife Refuge System. The 1982 MOA also limits vehicular access to Matagorda Island to those vehicles authorized to manage, enforce, or maintain the Wildlife Management Area. The 1982 MOA does not provide any role for Calhoun County in managing Matagorda Island.

On December 9, 1982, the State of Texas and the United States recorded the conservation easements in the Calhoun County Clerk's Office. On August 4, 1983, over considerable public controversy, Congress passed a bill enacting the 1982 MOA into law.

*D. This litigation*

On November 8, 1995, Calhoun County filed a petition for a declaratory judgment that it has valid title to real property on Matagorda Island claimed by the United States. Calhoun County's petition did not specify which areas of land it claimed to own, but did claim rights to "use, maintain and enjoy all of the public roads, beaches, historic sites and shrines, cemeteries and other real estate interests that [Calhoun County] still has and maintains on Matagorda Island." Calhoun County's petition argued that the initial 1940 taking was void because the United States failed to identify and serve Calhoun County as a defendant in that action. Calhoun County also argued that the expiration of the United States leasehold interests in the state-owned land, which the United States had condemned for successive terms of years, caused title to that land to revert to Calhoun County.

6

The United States moved to dismiss or alternatively for summary judgment. The United States argued that the 1940 condemnation action extinguished any property interests that Calhoun County may have had in the federally owned acreage on Matagorda Island and that Calhoun County's failure to file suit within twelve years from the time it received actual or constructive notice of the federal claims to that land barred any claims that Calhoun County may have had to that land. The district court concluded that Calhoun County could not satisfy the jurisdictional requirements of the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a (1997), because the QTA's twelve year statute of limitations had expired prior to Calhoun County's commencement of suit. *See* 28 U.S.C. § 2409a(g) through (j) (limitations periods for actions under QTA).

## II. Discussion

Calhoun County appeals the district court's dismissal of its complaint for failing to meet the jurisdictional requirements of the Quiet Title Act, 28 U.S.C. § 2409a (1997). This Court reviews a district court's grant of a motion to dismiss for lack of jurisdiction under a *de novo* standard of review. *Hebert v. United States,* 53 F.3d 720, 722 (5th Cir.1995). The district court's thorough order discussed several alternative bases for its dismissal, none of which are in error. Accordingly, we affirm the district court's dismissal of Calhoun County's complaint.

*A. The QTA's twelve year limitations period applies to Calhoun County's claim.*

The district court properly applied a twelve year statute of

7

limitations to Calhoun County's claim.  Section 2409a(g) provides:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).  Calhoun County is not a state; therefore, it is subject to this twelve year limitations period.  As the district court noted, however, even if Calhoun County, a subdivision of the State of Texas, was a state for purposes of the QTA, the applicable limitations period in this case would still be twelve years.  Section 2409a(i) provides:

> Any civil action brought by a State under this section with respect to lands, other than tide or submerged lands, on which the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments or on which the United States has conducted substantial activities pursuant to a management plan such as ... *wildlife habitat improvement,* or other similar activities, shall be barred unless the action is commenced within twelve years after the date the State received notice of the Federal claims to the lands.

28 U.S.C. § 2409a(i) (emphasis added).  As the district court pointed out, Calhoun County agrees that the United States and the State of Texas have conducted activities to improve the wildlife habitat on Matagorda Island since 1982.  As such, even under the limitations provisions applicable to states, a twelve year period would apply to this case.

*B. The QTA's statute of limitations bars Calhoun County's claim because the cause of action accrued more than twelve years before commencement of suit.*

The district court correctly found that Calhoun County had failed to comply with the QTA's twelve year statute of limitations.

8

The district court properly found that Calhoun County had actual and constructive notice of the United States' claim to the land on Matagorda Island by virtue of the 1982 MOA and the recording of the conservation easements with the Calhoun County Clerk's Office, thus beginning the limitations period more than twelve years before commencement of suit. *See California v. Yuba Goldfields, Inc.,* 752 F.2d 393, 396 (9th Cir.) (holding that recording of deed naming United States as grantee constituted actual notice of United States interest in property for QTA limitations purposes), *cert. denied sub nom., California State Lands Comm'n v. United States,* 474 U.S. 1005, 106 S.Ct. 526, 88 L.Ed.2d 458 (1985); *Lee v. United States,* 629 F.Supp. 721 (D.Alaska 1985) (holding that QTA limitations period began to run upon publication of notice of federal claims in Federal Register). The 1982 MOA, which Congress ratified, essentially enacted the proposals set forth in the EIS published in the Federal Register earlier that year. In addition, the United States had been landing planes and dropping bombs on the island from the 1940's until the 1970's, which is openly and notoriously inconsistent with any claims Calhoun County may have had to that land. Even under the QTA's notice provisions applicable to states, these circumstances constitute sufficient notice for purposes of accrual of an action. *See* 28 U.S.C. § 2409a(k) (providing that public communication reasonably calculated to put the claimant on notice of federal claim or open and notorious use, occupancy, or improvement constitutes notice for purposes of accrual of an action brought by a state).

*C. Equitable tolling does not apply to the facts of this case.*

In *Hart v. United States,* this Court rejected the proposition that equitable considerations might justify tolling the QTA's twelve year statute of limitations. 585 F.2d 1280, 1284-85 (5th Cir.1978) ("Whether the equitable considerations advanced by plaintiffs would be persuasive under other facts is wholly beside the point."), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979). In so construing the QTA, *Hart* noted that "[w]e have before us an Act of Congress that is understandable both in language and intent," 585 F.2d at 1285, and relied upon the well established proposition that statutes waiving immunity of the United States are subject to strict construction in favor of the United States. *Id.*

Since *Hart,* the Supreme Court has confirmed the applicability of equitable tolling against the United States. *See Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 95-96, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990) (establishing a general rule that "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States."). Although *Irwin* involved Title VII of the Civil Rights Act rather than the QTA, the Supreme Court's holding in *Irwin* does relax the maxim that courts must strictly construe waivers of sovereign immunity in favor of the sovereign, which the *Hart* panel interpreted as barring consideration of equitable tolling under the QTA. *See Irwin,* 498 U.S. at 94, 95, 111 S.Ct. at 457, 458. *Irwin* qualified that maxim by stating that "[o]nce

10

Congress has made such a waiver, we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver." *Id. Irwin* thus reinterpreted the intent behind congressional waivers of sovereign immunity, but did not necessarily alter the nature of conditions on that waiver, such as a statute of limitations.[1]

Since *Irwin,* the Fourth Circuit has continued to construe the QTA's statute of limitations as jurisdictional in nature. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 769 (4th Cir.1991) ("Because the limitations period represents a condition on the waiver of federal sovereign immunity, it is a jurisdictional prerequisite to suit and is to be construed narrowly in favor of the government."), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992); *see also, e.g., Vintilla v. United States,* 931 F.2d 1444 (11th Cir.1991) (adhering to

---

[1]In *Block v. North Dakota,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983), the Supreme Court held that if a suit under the QTA is time-barred by the statute of limitations, then federal courts have "no jurisdiction to inquire into the merits." 461 U.S. at 292, 103 S.Ct. at 1822. When the United States consents to be sued, "the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *United States v. Mottaz,* 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986). Under this line of cases, a statute of limitations constitutes a condition on the waiver of sovereign immunity, and thus, defines jurisdiction. *Id.* The Supreme Court has not overruled these decisions, but did, in *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) relax the underlying maxim that courts must strictly construe waivers of sovereign immunity in favor of the government. As such, the Court did allow for the possibility that courts may equitably toll limitations periods in actions against the government, but did not specifically discuss the QTA or the jurisdictional nature of its statute of limitations. *Id.* at 95-96, 111 S.Ct. at 457-458.

pre-*Irwin* mode of analysis and ruling that tax code limitations period may not be equitably tolled because timely filing of a refund claim is jurisdictional prerequisite to suit); *Knapp v. United States,* 636 F.2d 279, 282 (10th Cir.1980) (holding, pre-*Irwin,* that "timeliness ... is a jurisdictional prerequisite to suit under section 2409a."); *Dillard v. Runyon,* 928 F.Supp. 1316, 1323-24 (S.D.N.Y.1996) (arguing that *Irwin* does not extinguish jurisdictional nature of time limits on claims against federal government, and noting that "the Supreme Court in Irwin affirmed both lower courts' dismissals for lack of jurisdiction."), *aff'd,* 108 F.3d 1369 (2d Cir.1997).

We note, however, that other courts, including the Ninth Circuit, have held that *Irwin* eliminated the jurisdictional nature of statutes of limitation under statutes waiving sovereign immunity, apparently based on the rationale that equitable principles cannot expand a court's jurisdiction. *See, e.g., Fadem v. United States,* 52 F.3d 202 (9th Cir.1995) (holding that statute of limitations under QTA is not jurisdictional), *vacated,* --- U.S. ----, 117 S.Ct. 1103, 137 L.Ed.2d 306, *orig. opinion reinstated,* 113 F.3d 167 (9th Cir.1997); *see also Krueger v. Saiki,* 19 F.3d 1285, 1286 (8th Cir.) ("Because suits against the government are subject to equitable tolling, compliance with [Federal Tort Claims Act] limitations period is not a jurisdictional prerequisite to suing the government."), *cert. denied,* 513 U.S. 905, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994); *Schmidt v. United States,* 933 F.2d 639, 640 (8th Cir.1991) (holding that, as a result of *Irwin,* statutes of

12

limitations in actions against the government are affirmative defenses rather than jurisdictional bars).

We conclude below that the district court did not err in finding that the evidence showed Calhoun County's failure to satisfy the statute of limitations, regardless of equitable tolling. As such, this case does not require us to decide whether *Irwin* extinguished the jurisdictional nature of the QTA's statute of limitations, and we decline to do so.

After the district court ordered dismissal of Calhoun County's claim, a divided panel of this Court handed down a decision in *Beggerly v. United States,* 114 F.3d 484 (5th Cir.1997), *cert. petition filed,* 66 U.S.L.W. 3324 (Oct. 27, 1997). In *Beggerly,* the Court explicitly applied the doctrine of equitable tolling to a QTA claim, noting that "[e]quitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." 114 F.3d at 489 (quoting *Rashidi v. American President Lines,* 96 F.3d 124, 128 (5th Cir.1996)). In so holding, the Court cited the Supreme Court's *Irwin* decision for the proposition that "[e]quitable tolling may be applied against the United States." *Id.* at 489 n. 19. Intervening Supreme Court precedent had changed the law that *Hart* relied upon in refusing to consider the doctrine of equitable tolling in the context of a QTA claim; therefore, the Court in *Beggerly* was not bound by *Hart* and neither are we.

Although prior to this Court's decision in *Beggerly,* the

13

district court in this case correctly noted that Calhoun County could not rely on equitable tolling, even if the doctrine did apply. As such, the district court's analysis would stand regardless of the *Beggerly* panel's decision, which applied the doctrine of equitable tolling against the United States. 114 F.3d at 489. In *Beggerly,* the United States had, in a previous quiet title action, ostensibly conducted a thorough search of the public land records and formerly represented to the plaintiffs and the district court that the United States had never granted any part of the land in question to a private landowner and, therefore, that the United States was the title owner of that land. *Id.* at 486. That representation later turned out to be false. *Id.*

In contrast, in this case, the evidence showed that Calhoun County had notice of the United States' claim in 1982 at the latest, when the FWS and the GSA published the EIS in the Federal Register. As a result, the statute of limitations began to run in 1982 and expired before Calhoun County commenced this action, unless the statute was equitably tolled. The evidence before the district court did not include any evidence of active misrepresentation or extraordinary prevention by the United States that would justify the application of equitable tolling under *Beggerly;* therefore, we affirm the district court's dismissal.

AFFIRMED.